Richard **HATHAWAY** and Sharleen Hathaway, Plaintiffs,

v.

**COUNTY OF ESSEX; Town of Ticonderoga; Richard Sypek, State Police Investigator; John McDonald, Former Essex County District Attorney; Ronald Briggs, District Attorney of the County of Essex; Michael Connery, Supervisor of the Town of Ticonderoga; Marie Huntington, Ticonderoga Town Board Member; Mary Gail Russell, Chairperson of the Town of Ticonderoga Youth Commission; Andrew Powvorznik, Ticonderoga Town Board Member; All Individually and in Their Official Capacities, Defendants.**

No. 95–CV–824.

United States District Court, N.D. New York.

Feb. 18, 1998.

---

Ackerman, Wachs & Finton, P.C., Albany, NY, for Plaintiffs, F. Stanton Ackerman, of counsel.

Fitzgerald Morris, Baker Firth, P.C., Glens Falls, NY, for Defendants Town of Ticonderoga, Michael Connery, Marie Huntington, Mary Gail Russell and Andrew Powvorznik, Robert P. McNally, of counsel.

## MEMORANDUM, DECISION AND ORDER

McAVOY, Chief Judge.

In this § 1983 action for malicious prosecution, defendants Town of Ticonderoga, Michael Connery, Marie Huntington, Mary Gail Russell and Andrew Powvorznik move under Fed.R.Civ.P. 12(c) for judgment on the pleadings, or, in the alternative, for summary judgment pursuant to Fed.R.Civ.P. 56.

## I. Background

### A. Facts

Between February, 1992, and June, 1994, plaintiff Richard Hathaway was investigated, indicted, and tried on charges of official misconduct, petit larceny, grand larceny, and perjury. All of these charges were dismissed before the case went to the jury.

Defendant Michael Connery has been Town Supervisor of defendant Town of Ticonderoga ("the Town") since January 1, 1990. Defendant Marie Huntington has been a member of the Town Board since January 2, 1992. At all relevant times, defendant Andrew Powvorznik was a member of the Town Board and an appointed member of the governing board of the Town Youth Commission ("Youth Commission" or "Commission"). At all relevant times, defendant Mary Gail Russell was the Chairperson of the Commission, but was not a member of the Town Board.

Plaintiff Richard Hathaway was the paid director of the Youth Commission from 1986 until his resignation in late January of 1992. The Youth Commission is a program of the Town and Village of Ticonderoga charged with, *inter alia,* providing recreational opportunities to children and young adults. The Youth Commission is governed by a board consisting of persons appointed by the Town Board.

All parties acknowledge that prior to 1992, considerable acrimony had developed between plaintiff and certain members of the Youth Commission. Defendants allege the source of the tension was numerous disputes regarding the finances of the Youth Commission and accounts plaintiff had used to pay Commission expenses. Def. Rule 7.1(f) Stat. ¶ 7. Defendants also allege plaintiff was using the same account to operate both the Commission and a private organization with which he was involved, known as "Youth to Youth." Plaintiff, on the other hand, contends the conflicts arose out of allegations of nepotism he raised to the Commission. Pl. Aff. ¶ 16. Plaintiff also alleges it was a vengeful neighbor who first raised the concerns regarding Youth to Youth. *Id.*

Part of plaintiff's duties as director of the Commission was to arrange several weekend ski trips during the winter for children and adults in the Ticonderoga area. Def. Rule 7.1(f) Stat. ¶ 8; Pl. Aff. ¶¶ 6–10. Participating children skied at a discounted price. The difference between the discounted price and the full price charged by the ski site was paid by the Town Board. Pl. Aff. ¶ 13; Pl. Dep.

at 194–95. Plaintiff collected money from the ski participants on the bus during the trip to the ski site. Pl. Dep. at 186–87. The payments were by cash or check, and plaintiff kept no record with respect to the amount collected on a given trip. *Id.* at 190. The cost of the trip would include, for each individual, the price of a lift ticket. Moreover, children without ski equipment would pay a discounted rental fee, with the Town Board again making up the difference.

Plaintiff estimates that anywhere from fifty to over one hundred people may have participated in a trip. Pl. Dep. at 205. Moreover, because children who could not afford the trip were allowed to ski free, anywhere from ten to twenty child participants did not pay. *Id.* The free skiers, combined with the discount, obviously resulted in a shortfall in the amount of money plaintiff collected on each trip compared to the total cost of the trip. The money plaintiff collected from the participants, however, lies at the center of the present dispute.

Once the money was collected from the participants on the bus, a voucher was turned in to the ski site. The voucher indicated the number of lift tickets used during the trip, for which the Town was billed in the entirety. Pl. Dep. at 200.[1] As for the payments collected during the trip, plaintiff testified at his deposition that these amounts were applied during the trip for the rental payments of both discounted and free skiers. *Id.* at 200–01.[2] The cash also was applied to repair broken equipment or purchase new equipment. *Id.* at 203–04. The checks collected were deposited in the Youth to Youth Account. *Id.* at 204–05. Plaintiff kept no records or receipts whatsoever regarding the number of children that skied free, amounts expended on equipment purchases or repairs,

or any other expenses to which the cash payments were applied.

On the occasions when plaintiff had cash left over (he doesn't know how many times this occurred), he brought the cash to his home and kept it there. Pl. Dep. at 207. On some occasions, he did not deposit the money for weeks or months. *Id.*[3] He also would use the cash during the 1990–91 period for purposes unrelated to the ski program, i.e., equipment and food for Youth Commission purposes, but he kept no records of any such purchases. *Id.* at 208. Nor did plaintiff report his use of the money to the Youth Commission. *Id.* at 209.

When plaintiff resigned his position as Director of the Youth Commission in January of 1992, Jim Wells took over as supervisor of the ski trips. After the first trip in which Wells took part, the Town Budget Clerk, Sandra Hurlburt, reported to Connery that Wells had turned over to the Town the money he had collected from the participants in the ski trip. Connery Dep. at 30. Connery, apparently wondering why plaintiff never turned such money over, brought the matter to the attention of Town Attorney Gerald Lawson, who told Connery to call a Board meeting. *Id.* at 29–30. Connery did so; present at the meeting were Huntington, Powvorznik, Connery and Lawson. *Id.* at 33.

At the meeting, Lawson advised the Board to contact the District Attorney's office regarding the situation with the ski money, and the Board directed Connery to do so. On March 16, 1993, Connery met with then-District Attorney John McDonald and New York State Police Investigator Richard Sypek. Connery told them it had come to the Board's attention, apparently because Wells turned in the collected ski money, that Hathaway had turned over no such money during his tenure as supervisor of the ski trips.

1. Defendants contend the Town would pay the bill sent to it from the ski center in the mistaken belief that the ski lift monies collected by plaintiff had been paid to the ski area on the day of the ski trip. Def. Rule 7.1(f) Stat. ¶ 13. "In other words, the Town Board understood that the Town was being billed for the difference between the actual cost of skiing and the reduced rate charged to the participants." *Id.*

2. Vouchers were not used for ski rentals because the rentals were handled by a company independent from the ski site. Huntington Grand Jury Testimony of 1/20/93 at 25.

3. Plaintiff in fact deposited no ski money during 1990 or 1991. He did make a deposit in 1988, for $268.00, and one in 1989, for $794.00. He also made a deposit of $259.00 on the day before he resigned in January of 1992.

McDonald Aff. ¶ 7. Later that day, McDonald formally requested that Sypek investigate the matter. *Id.* ¶ 8 and Ex. A. Sypek proceeded with the investigation.

Meantime, Huntington began an investigation of her own. After reviewing vouchers, receipts and other records, she determined that approximately $3,037 was unaccounted for in 1990–91. *See* Def. Ex. F.[4] Sypek, during his investigation, concluded the unaccounted for sum was a minimum of $3,787.00. Pl. Ex C at 7. As part of the investigation, Sypek interviewed plaintiff. During that interview, plaintiff tried to explain to Sypek that the free skiers on each trip would have a significant impact on the calculations, and that plaintiff was guilty only of poor bookkeeping. Pl. Dep. at 58.

After reviewing the results of Sypek's investigation, McDonald decided there was reasonable cause to begin a criminal prosecution of plaintiff by presenting the matter to the Grand Jury. McDonald Aff. ¶ 11. After several postponements in the Fall of 1992, the case finally was presented to the Grand Jury on January 20–21 and March 4, 1993. Sypek, Connery, Huntington, Powvorznik, Hurlburt, Russell and plaintiff, among others, testified. Thereafter, the Grand Jury returned five indictments against plaintiff charging: (1) fifteen counts of Official Misconduct, N.Y. Pen. L. § 195.00(1); (2) fifteen counts of Petit Larceny, N.Y. Pen. L. § 155.25; (3) one count of Grand Larceny, N.Y. Pen. L. § 155.30(1); and (4) one count each of First Degree and Third Degree Perjury, N.Y. Pen. L §§ 210.15, 210.05.

Plaintiff thereafter moved for dismissal of the indictments. Judge James Dawson denied the motion on November 12, 1993. The case was tried before a jury on June 14–16, 1994. Judge Dawson dismissed the perjury and larceny charges at the close of the People's evidence pursuant to N.Y.Crim. Pro. L. § 290.10(1). At the close of all the evidence but before submitting the case to the jury, Judge Dawson dismissed all remaining counts under the same provision.[5]

## B. Procedural History

Plaintiff filed his Complaint on June 15, 1995. On December 19, 1995, this Court granted, without prejudice, Sypek's motion to dismiss the Complaint for failure to state a claim upon which relief may be granted. Plaintiff subsequently filed an amended Complaint on January 8, 1996. The Amended Complaint alleges violations of plaintiff's First, Fourth, Fifth and Fourteenth Amendment rights. Plaintiff also brings state law claims for malicious prosecution, abuse of process, and intentional/negligent infliction of emotional distress. His wife brings a claim for loss of consortium. Plaintiff and his wife seek both compensatory and punitive damages.

**4.** Defendants' Exhibit F is a copy of Huntington's handwritten conclusions resulting from her investigation. In a specious attempt to cast doubt on Huntington's version of when she began the investigation, plaintiff argues

the date on [defendants' Exhibit F] indicates that her investigation was completed by January 6, 1992 almost an entire month before Mr. Wells turned in money. The importance of this fact is that if the investigation was started prior to January 28th, 1992, Ms Huntington is misleading the Grand Jury about the time and reason for her investigation. This lends credibility to the Plaintiff's position, and when taken with the tone of her testimony, clearly shows she was out to have him ousted from the Youth Commission for her own motives.

Pl. Mem. of Law at 10–11. In his affidavit, plaintiff contends the document was written January 6, 1991. Pl. Aff. ¶ 24. Both assertions obviously are incorrect. Though it is unclear when the document was created (the date to

which plaintiff refers is readable only as "1–6"), it could not have been created before plaintiff's resignation in late January 1992, for the simple fact that it refers to events that occurred *after* plaintiff's resignation, e.g., "Jan.1992 when Jim Wells took over" and "recieved [sic] from Richard Hathaway $259.00." *See* Pl.Ex. O. The document in fact refers to the $458.00 turned over by Wells that led to the investigation in the first place. The Court thus declines to draw the inferences plaintiff urges.

**5.** § 290.10(1) provides, in pertinent part, as follows:

At the conclusion of the people's case or at the conclusion of all the evidence, the court may . . . upon motion of the defendant, (a) issue a "trial order of dismissal," dismissing any count of an indictment upon the ground that the trial evidence is not legally sufficient to establish the offense charged therein or any lesser included offense . . .

The action against defendant Robert Collins was dismissed by order dated May 5, 1996. Defendants Briggs and Sypek were dismissed by stipulations filed January 24, 1997 and February 5, 1997, respectively. On March 28, 1997, defendants County of Essex, John McDonald, and Ronald Briggs moved for judgment on the pleadings, summary judgment, and/or to dismiss the complaint. The Court granted the motion for summary judgment in a memorandum, decision and order dated August 30, 1997.

The remaining defendants now move for judgment on the pleadings, or, in the alternative, summary judgment.

## II. DISCUSSION

### A. Standard for Summary Judgment

Fed.R.Civ.P. 12(c) states that "if, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment, and disposed of as provided in Rule 56." Both parties have submitted matters outside the pleadings. Based upon these submissions, and the fact that plaintiff was on notice that this motion was, in the alternative, for summary judgment, the Court sees no reason why it should not treat this motion as one for summary judgment.

Under Fed.R.Civ.P. 56(c), if there is "no genuine issue as to any material fact . . . the moving party is entitled to a judgment as a matter of law . . . where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The burden to demonstrate that no genuine issue of material fact exists falls solely on the moving party. *Heyman v. Commerce and Indus. Ins. Co*, 524 F.2d 1317 (2d Cir.1975).

Once the moving party has met its burden, the non-moving party must come forward with specific facts showing there is a genuine issue for trial. *Matsushita*, 475 U.S. at 585–86. A dispute regarding a material fact is genuine "if evidence is such that a reasonable jury could return a verdict for the non-mov-

ing party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is proper when reasonable minds could not differ as to the import of the evidence. *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.), *cert. denied*, 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991). The motion will not be defeated by a non-movant who raises merely a "metaphysical doubt" concerning the facts or who only offers conjecture or surmise. *Delaware & Hudson Ry. Co. v. Consolidated Rail*, 902 F.2d 174, 178 (2d Cir.1990), *cert. denied*, 500 U.S. 928, 111 S.Ct. 2041, 114 L.Ed.2d 125 (1991)(quoting *Matsushita*, 475 U.S. at 586).

It is with this standard in mind that the Court addresses defendants' motion.

### B. Plaintiff's § 1983 claims

#### 1. Malicious Prosecution

Though plaintiff's malicious prosecution claim is a federal claim for violation of his Fourth Amendment right to be free from unreasonable seizures, *see Albright v. Oliver*, 510 U.S. 266, 274–75, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994); *Singer v. Fulton County Sheriff*, 63 F.3d 110, 116 (2d Cir.1995), *cert. denied*, 517 U.S. 1189, 116 S.Ct. 1676, 134 L.Ed.2d 779 (1996), the elements of this cause of action are otherwise identical to a state law malicious prosecution claim. *See Cook v. Sheldon*, 41 F.3d 73, 79 (2d Cir.1994); *Raysor v. Port Authority of New York and New Jersey*, 768 F.2d 34, 39 (2d Cir.1985), *cert. denied*, 475 U.S. 1027, 106 S.Ct. 1227, 89 L.Ed.2d 337 (1986). Under New York State law, the elements of a malicious prosecution claim are:(1) the commencement or continuation of a criminal proceeding by defendants against plaintiff, (2) the termination of that proceeding in favor of the plaintiff, (3) the absence of probable cause for the criminal proceeding and (4) actual malice. *See Colon v. City of New York*, 60 N.Y.2d 78, 82, 468 N.Y.S.2d 453, 455 N.E.2d 1248 (1983); *Pomento v. City of Rome*, 231 A.D.2d 875, 647 N.Y.S.2d 604, 605 (4th Dep't 1996); *Janendo v. Town of New Paltz Police Dep't*, 211 A.D.2d 894, 621 N.Y.S.2d 175, 177 (3d Dep't 1995).

Defendants argue they are entitled to summary judgment since plaintiff can raise no issue of fact as to the lack of probable cause for his prosecution. As the Court noted, plaintiff was indicted by a Grand Jury, and those indictments withstood a pre-trial motion to dismiss. "Once a suspect has been indicted ... the law holds that the Grand Jury action creates a presumption of probable cause." *Colon*, 60 N.Y.2d at 82, 468 N.Y.S.2d 453, 455 N.E.2d 1248. "Moreover, a determination by a magistrate after a preliminary hearing to sustain a complaint and deny a plaintiff's motion to dismiss a pending criminal charge establishes a prima facie case of probable cause for the prosecution." *Landsman v. Moss*, 133 A.D.2d 359, 519 N.Y.S.2d 262, 263 (2d Dep't 1987); *see Gisondi v. Town of Harrison*, 120 A.D.2d 48, 507 N.Y.S.2d 419, 422 (2d Dep't 1986).

"The presumption may be overcome only by evidence establishing that the ... witnesses have not made a complete and full statement of facts either to the Grand Jury or to the District Attorney, that they have misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith." *Colon*, 60 N.Y.2d at 82, 468 N.Y.S.2d 453, 455 N.E.2d 1248. Plaintiff argues that defendants testified falsely before the Grand Jury or misrepresented certain facts forming the basis of the indictments. None of the evidence relied upon by plaintiff, however, is sufficient to create a factual issue as to the lack of probable cause.

■ As an initial matter, many of the alleged acts of misrepresentation or falsification of evidence before the Grand Jury to which plaintiff points are not actionable under § 1983. It is axiomatic that § 1983 provides a remedy only for violations of constitutional rights by a person acting under color of law. *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). However, "[a] witness testifying in a state court proceeding—even if he is a state employee who has perjured himself—has not acted under color of state law for purposes of § 1983." *McArthur v. Bell*, 788 F.Supp. 706, 710 (E.D.N.Y.1992);

*see Bennett v. Passic*, 545 F.2d 1260, 1263–1264 (10th Cir.1976); *Bates v. New York City Transit Auth.*, 721 F.Supp. 1577, 1580 (E.D.N.Y.1989). Thus, plaintiff's allegations that defendants perjured themselves or misled the Grand Jury simply are not actionable under § 1983.

■ Moreover, plaintiff grasps at the most circumstantial of straws in attempting to overcome the presumption. His claims of perjury or falsification simply are not supported by the evidence, even when that evidence is viewed in his favor. First, plaintiff argues that the figures Huntington arrived at as to the missing funds (to which she testified before the Grand Jury) did not account for free skiers, even though Huntington knew free skiers may have been present on a given trip. As defendants point out, however, neither Huntington nor anyone else trying to run the numbers could take free skiers into account *because there was no record of the number of free skiers that participated in any trip*. Plaintiff himself testified as to the free skiers before the Grand Jury, but provided no evidence of the number of free skiers, likely because he never kept any such records.

Plaintiff also argues Huntington's testimony before the Grand Jury was misleading. Huntington testified that free skiers were never mentioned to the Town Board or Youth Commission and expressed doubts about the impact such skiers would have on her figures. However, plaintiff points only to isolated references to "free skiers" in the minutes of Town Board meetings, all of which occurred prior to Huntington's tenure. Moreover, plaintiff himself hardly is in a position to dispute Huntington's assessment of the impact free skiers would have on the figures, given the fact that he has no records of the free skiers.

Plaintiff additionally attempts to create a fact issue by pointing to what he perceives to be conflicting testimony of defendants before the Grand Jury. For example, plaintiff contends Powvorznik testified before the Grand Jury that Town Board members questioned plaintiff about the shortfall in funds from the ski program, *see* Pl.Ex. F. at 14, but denied in his deposition that anyone spoke to plain-

tiff about the matter. *See* Powvorznik Dep. at 70. Plaintiff mischaracterizes Powvorznik's Grand Jury testimony. Powvorznik indicated at the Grand Jury hearing that Town Board members requested that plaintiff turn over certain records. *See* Pl.Ex. F at 15. He did not testify that the Town Board questioned plaintiff about the missing ski monies.

The remaining evidence relied upon by plaintiff to overcome the presumption is comprised of allegedly conflicting testimony at the Grand Jury hearing, perceived shortcomings in defendants' investigation, and plaintiff's speculative allegations regarding defendants' motives. None of the evidence is sufficient to raise a fact issue on the question of probable cause. Reliance on variations in testimony, as well as defendants' failure to pursue further avenues of investigation, as evidence of fraud, suppression of evidence, or perjury are insufficient to overcome the presumption of probable cause. *See Lawson v. New York City Housing Auth.*, 223 A.D.2d 532, 636 N.Y.S.2d 126, 127 (2d Dep't 1996). The fact is, the presumption of probable cause arising from the indictments notwithstanding, plaintiff's well-documented and undisputed failure to account for Town money gave rise to ample probable cause.

For all of the foregoing reasons, defendants' motion for summary judgment is granted as to plaintiff's § 1983 claim for malicious prosecution.

## 2. Plaintiff's First Amendment Claim

Plaintiff also makes mention in his memorandum of law of a First Amendment claim. In support of this claim, plaintiff submits the minutes of a Town Board meeting from November 17, 1994, which read, in pertinent part, as follows:

Richard Hathaway was present to ask the Town Board for support for funds to transport youth to a seminar. He asked about the youth commission budget and stated there are funds there that could be used for this purpose. He told the board they could make one of two motions. The first to approve the money for the transportation of [sic] the second to tell Richard Hathaway to leave the board alone from no [sic] on. Marie Huntington stated she pre-

ferred the second option and moved to have Richard Hathaway leave the board alone. Virginia LaPointe seconded. 4 ayes. Andrew Powvorznik absent.

Virginia laPointe clarified ... that the Town Board cannot give money to private charities.

Pl.Ex. T at 2. No reasonable juror, however, could seriously conclude this "motion" constituted a violation of plaintiff's free speech rights. The Town Board obviously was responding in kind to plaintiff's sarcastic invitation. There is no evidence in the record that plaintiff was barred or excluded from any Board meetings, or that the Board at any time refused to allow plaintiff to speak.

For these reasons, plaintiff's § 1983 claim premised upon a First Amendment violation is dismissed.

## 3. *Monell* Liability

Because plaintiff raises no fact issue as to any substantive violations under § 1983 sufficient to withstand summary judgment, his claims against the Town under *Monell v. Dep't of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), must be dismissed as well. *See Leone v. Creighton*, 948 F.Supp. 192, 197 (E.D.N.Y.1996).

## C. Plaintiff's State Law Claims

## 1. Intentional Infliction of Emotional Distress

The tort of intentional infliction of emotional distress has four elements: (1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress. *See Howell v. New York Post Co.*, 81 N.Y.2d 115, 596 N.Y.S.2d 350, 353, 612 N.E.2d 699 (1993). The conduct must be " 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized [society].' " *Murphy v. American Home Products Corp.*, 58 N.Y.2d 293, 461 N.Y.S.2d 232, 236, 448 N.E.2d 86 (1983) (quoting Restatement of Torts, Second, § 46 cmt. d (1965)).

None of plaintiff's allegations remotely rise to the level of outrageous conduct

sufficient to prevail on his intentional infliction of emotional distress claim. Thus, summary judgment is granted in this respect.

### 2. Malicious Prosecution/Abuse of Process

Because plaintiff's state law claims for malicious prosecution and abuse of process each require that plaintiff prove lack of probable cause, they must be dismissed in accordance with the Court's earlier discussion.

### 3. Loss of Consortium

Finally, because all of plaintiff's causes of action have been dismissed against defendants, the derivative claim must be dismissed as well. *See Gerzog v. London Fog Corp.*, 907 F.Supp. 590, 605 (E.D.N.Y.1995); *Milam v. Herrlin*, 819 F.Supp. 295, 306 (S.D.N.Y. 1993).

### III. CONCLUSION

Plaintiff's remaining contentions, scattered throughout his papers submitted on this motion, are without merit. For all of the foregoing reasons, defendants' motion for summary judgment is **GRANTED**, and the Complaint, in its entirety, is **DISMISSED**. **IT IS SO ORDERED**