Victor J. CIPOLLA and Susan
E. Martin, Plaintiffs,

v.

The COUNTY OF RENSSELAER,
County of Rensselaer Executive's Of-
fice, Henry Zwack, individually and as
County Executive for the County of
Rensselaer, Joseph Cybulski, individu-
ally and as Deputy County Executive
for the County of Rensselaer, Daniel
Ehring, individually and as Deputy
County Attorney for the County of
Rensselaer, Jack Madden, individually
and in his capacity as Stop DWI Coor-
dinator for the County of Rensselaer,
John Doe, an individual whose name
is unknown to plaintiffs individually
and in his capacity as an official of
the County of Rensselaer, Jane Doe,
an individual whose name is unknown
to plaintiffs, individually and in her
capacity as an official of the County
of Rensselaer, and ABC Department,
an office or department of the County
of Rensselaer whose identity is un-
known to the plaintiffs, Defendants.

No. 99–CV–1813.

United States District Court,
N.D. New York.

Sept. 14, 2000.

Joseph R. DeMatteo, New York City, Joseph R. DeMatteo, of counsel, for Plaintiffs.

Jeffrey L. Bernfeld, New York City, Jeffrey L. Bernfeld, of counsel for Plaintiffs.

Dreyer Boyajian LLP, Albany, NY, William J. Dreyer, Daniel J. Stewart, of counsel, for Defendants.

## MEMORANDUM—DECISION & ORDER

McAVOY, District Judge.

### I. Background

Plaintiffs Victor Cipolla and Susan Martin are former employees of Rensselaer County (the "County") whose claims arise out of their criminal prosecution for official misconduct.[1] Defendant Henry Zwack was the elected County Executive at the time of Plaintiffs' prosecution; Steve Madden and Joseph Cybulski were employees of the County;[2] and Defendant Daniel Ehring was a Deputy County Attorney,[3] who served as a contact between the County and the District Attorney's office throughout the investigation and prosecution. A brief outline of the events leading up this prosecution follows.

Zwack was elected as County Executive in late 1995 and took office on January 1, 1996. Prior to his election, Zwack served on the County Legislature. During the period after Zwack's election, but prior to his taking office, the individual Defendants and Plaintiffs worked with the outgoing County Executive and administration to facilitate a smooth transition between administrations. Zwack wanted to make numerous organizational changes in the County government. Because the changes needed to be made while Zwack was a county legislator, they had to be signed by the outgoing County Executive.[4] The outgoing County Executive made certain demands on Zwack, including the continued employment of five County employees, in exchange for his agreement to sign the organizational changes into law. One of these employees was Dirk Van Ort.

Because the changes Zwack made prior to taking office included elimination of Van Ort's position[5] and the department from which that position was funded, it became necessary to find a new position for Van Ort. Zwack reassigned Van Ort to the Department of Emergency Services, run by David Cooke. Cooke objected to this placement and Zwack then assigned Van Ort to Cipolla's Department, BRIS. Although Cipolla objected to this placement, Zwack refused to reassign Van Ort.[6]

It does not appear that anyone was given any instructions regarding how to use

1. Defendant Henry Zwack appointed Plaintiffs Cipolla and Martin to the positions of department head of the Bureau for Research and Information Services ("BRIS") and Assistant for Labor Relations and Personnel, respectively.

2. Zwack appointed Defendant Cybulski as Deputy County Executive and Commissioner of Aging, Veterans, and Youth and Madden was retained as the Stop DWI Coordinator.

3. The County hired Ehring in 1996.

4. During this time, the political make up of the County Legislature favored the republican party 10–9. The republican majority would disappear when Zwack, a republican, became County Executive. Thus, in order to get his organizational changes approved by the re-

publican legislature, the changes had to be put to vote before Zwack left.

5. It appears that Van Ort was an "on call" employee for the outgoing administration. He did not come to the office every day; rather, he attended certain meetings and performed other tasks outside of the office involving emergency services.

6. According to Zwack's grand jury testimony, although Cipolla complained about Van Ort's placement, there was work in BRIS which Van Ort could do. *See* Zwack Testimony, July 22, 1997 Grand Jury Tr. at 36–37 ("Victor came in and complained about Dirk Van Ort, and my response was something to the effect of, 'You wanted to be a department head. You wanted to be a manager… he is your employee. You've got work.' ").

Van Ort and, after his reassignment, Van Ort was given little, if any, job direction.[7] Throughout 1996, Van Ort's County employment continued. He did not report to work at the County offices and was not assigned work by Plaintiffs or Defendants, but continued to submit time cards, which were signed by himself and, in some cases, Cipolla. During this period, Cipolla continued to sign payroll authorization sheets for Van Ort's work.[8] At Martin's direction the payroll authorizations were processed, despite certain irregularities. Plaintiffs do not dispute the above facts. However, they allege that they signed and processed Van Ort's time cards and the related payroll authorization sheets under protest and pursuant to direct instructions from Zwack. *See* Cipolla Aff.; Martin Aff.

Cipolla acknowledges that, technically speaking, he was Van Ort's supervisor. There is dispute as to who was responsible for actually supervising Van Ort and assigning him work. Plaintiffs allege that Zwack specifically told Cipolla not to contact Van Ort, that Madden was responsible for finding Van Ort work, and that Cipolla was instructed to sign Van Ort's time cards. Defendants, on the other hand, contend that Cipolla was in charge of finding Van Ort work and supervising him. In contrast to both of the above view points, Van Ort testified before the grand jury that Martin was his contact person who he expected to assign his work. *See* Van Ort Testimony, Sept. 3, 1997 Grand Jury Tr. at 73.

In 1996, Zwack agreed to place Van Ort on an early retirement list and Van Ort retired in December 1996. In late 1996, Zwack asked for Plaintiffs' resignations.

In December 1996, Cipolla resigned. Martin refused and, thus, was terminated.

In or about February 1997, the news media began investigating and reporting a series of stories regarding the alleged improprieties committed by the Zwack administration. The stories included that of Van Ort, an alleged "no show employee." Public statements of some of the Defendants to the media indicated that Cipolla was responsible for supervising and finding work for Van Ort.

The County District Attorney's office convened a grand jury in 1997 to investigate allegations that Van Ort was a no show employee of the County. The grand jury heard testimony from Christina Mahoney, the County Director of Personnel as of April 28, 1997; Jennifer Fitzpatrick, the County employee in charge of inputting the County payroll in 1996; Manette Eddy, the Deputy Commissioner of BRIS in 1996; David Cooke, the County's Director of Public Safety in 1996;[9] Rebecca Syrotinski, an address verifier for the County in 1996;[10] Trudy Clayton, the secretary to BRIS in 1996; Zwack; Cybulski; Madden; Lisa Sanders, an address verifier for the County in 1996; Kathleen Van Ort, Dirk Van Ort's wife; Dirk Van Ort; Marion Gould, secretary to the County Executive; and Barbara Manoni, a County benefits representative. The grand jury voted to subpoena Plaintiffs who elected not to waive their immunity and, thus, did not testify. The grand jury also reviewed documentary evidence including, *inter alia,* Van Ort's time cards, the payroll authorization sheets signed by Cipolla, and letters

---

7. Van Ort testified before the grand jury that Zwack and Martin told him to continue to do the things he had done before "firematically." Van Ort Testimony, Sept. 3, 1997 Grand Jury Tr. at 75.

8. County employees submit time cards each payroll period, which should be signed by both the employee and that employee's supervisor. Each County department has a payroll clerk. That clerk fills out the information on the time authorization sheets, which are signed by the department heads and then input (by another department) for payroll. *See* Fitzpatrick Testimony, July 9, 1997 Grand Jury Tr. 80–85.

9. Cooke's department was responsible for emergency services.

10. Address verifier's verify addresses for the County 911 emergency system.

written to Van Ort regarding his employment status.

The grand jury elected to hear legal charges regarding potential criminal indictments of Van Ort, Martin, Cipolla, and Zwack. The grand jury was charged and, after deliberation, indicted Plaintiffs for official misconduct and Van Ort for second degree offering of a false instrument and falsifying business records. The charges against Plaintiffs were based on the grand jury's belief that the facts indicated that Plaintiffs were responsible for finding work for Van Ort and or supervising this work, that they did not find this work, and that they signed and processed Van Ort's time cards with knowledge that Van Ort had not performed work for the County and, in doing so, concealed the fact that they had not found Van Ort work. *See* Sept. 4, 1997 Grand Jury Tr. at 157, 161. The grand jury further found that Plaintiffs benefitted from the above actions by retaining their County jobs. *See id.* The grand jury voted against indicting Zwack.

Van Ort pled guilty to one charge of offering a false instrument and was sentenced to 100 hours of community service and fined $1,000.00. Plaintiffs went to trial on the misdemeanor charges. On November 30, 1998, a jury acquitted Plaintiffs of all charges.

On October 27, 1999, Plaintiffs commenced this action pursuant to 42 U.S.C. § 1983 ("Section 1983"), alleging causes of action for violations of their right to due process of law as protected by the Fourteenth Amendment (defamation), malicious prosecution, and conspiracy to present false evidence and testimony before the grand jury and at trial. Plaintiffs further allege state law claims for: (1) malicious prosecution; (2) defamation; (3) the intentional and negligent infliction of emotional distress; and (4) prima facie tort and a claim under Local Law 5 for legal fees.

Presently before the Court is Defendants' motion pursuant to FED. R. CIV. P. 8 or, in the alternative, FED. R. CIV. P. 12, seeking dismissal of the Complaint in its entirety.

## II. Discussion

### A. Federal Rule of Civil Procedure 8

Defendants first move to dismiss Plaintiffs' Complaint pursuant to FED. R. CIV. P. 8. Rule 8 provides that a complaint shall contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The complaint must disclose sufficient information to permit the defendant "to have a fair understanding of what the plaintiff is complaining about and to know whether there is a legal basis for recovery." *Ricciuti v. N.Y.C. Transit Auth.,* 941 F.2d 119, 123 (2d Cir.1991). Where a complaint alleges claims under 42 U.S.C. § 1983, it must be organized such that a preliminary decision on the issue of qualified immunity is feasible. *See Connell v. Signoracci,* 153 F.3d 74 (2d Cir. 1998).

Here, Defendants allege that the Complaint, which is 33 pages in length with 89 substantive paragraphs, is defective because it combines the allegations against each defendant and, thus, frustrates a determination of qualified immunity. The Complaint, however, appears to allege that all the Defendants engaged in certain conduct. In such cases, it is unnecessary to put forth a separate paragraph alleging that each Defendant engaged in the same conduct. Accordingly, the Court finds that the Complaint satisfies Rule 8 and does not impede a timely decision on qualified immunity.

Defendants next argue that Plaintiffs' conspiracy claim should be dismissed pursuant to FED. R. CIV. P. 8 because it is conclusory. This argument is more appropriately addressed under the FED. R. CIV. P. 12 standard as it involves Plaintiffs' alleged failure to state a claim, rather than the structure of Plaintiffs' pleadings. Accordingly, the Court will address this argument below.

## B. Conversion to Summary Judgment

Pursuant to FED. R. CIV. P. 12(c), "[i]f, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment ... and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." In the present matter, Defendants, the original moving parties, submitted materials outside of the pleadings.[11] In response, Plaintiffs also submitted materials outside of the pleadings, noted that Defendants' motion "blend[ed] principals applicable to motions to dismiss and motions for summary judgment," Pl. Mem. of Law at 2, and addressed the summary judgment standard. *See id.* at 9. In their reply papers, Defendants treat their motion as a motion for summary judgment. Accordingly, both parties are on notice that the Court could treat this motion as a motion for summary judgment and, thus, could consider materials submitted outside the pleadings. Because both parties have had a full and fair opportunity to present and, in fact, have presented, materials pertinent to a Rule 56 motion, the Court will treat the pending motions as if made pursuant to Rule 56.[12] *See G & A Books, Inc. v. Stern,* 770 F.2d 288, 295 (2d Cir.1985), *cert. denied,* 475 U.S. 1015, 106 S.Ct. 1195, 89 L.Ed.2d 310 (1986); *Citizens Accord Inc. v. Town of Rochester,* 2000 WL 504132 (N.D.N.Y. Apr.18, 2000).

## C. Summary Judgment Standard

This Court has set forth the applicable standard for summary judgment in numerous reported decisions, *see, e.g., Hoffman v. County of Delaware,* 41 F.Supp.2d 195 (N.D.N.Y.1999), *aff'd,* 2000 WL 232757 (2d Cir.2000), and need not restate it here. The Court will apply the standards set out in those decisions to the pending motions.

## D. Section 1983 Claims

"A § 1983 claim has two essential elements: (1) the defendant acted under color of state law; and (2) as a result of the defendant[s'] actions, the plaintiff[s] suffered a denial of [their] federal statutory rights, or [their] constitutional rights or privileges." *Annis v. County of Westchester,* 136 F.3d 239, 245 (2d Cir.1998). Here, Plaintiffs allege that because Defendants are (or were) County employees, they were acting under color of state law. Plaintiffs further contend that, while acting under color of state law, Defendants violated their constitutional rights under the Fourth and Fourteenth Amendments to be free from defamation and malicious prosecution. Plaintiffs further allege that Defendants engaged in a conspiracy to violate the above constitutional rights.

### 1. Due Process

Plaintiffs' due process claims are based on allegedly defamatory public statements Defendants made, reaffirmed to the media, and repeated in testimony to the grand jury and at trial. *See* Complaint ¶¶ 36, 37.

---

11. Defendants also included a statement of material facts, pursuant to Local Rule 7.1(a)(3), as is required for a summary judgment motion.

12. Plaintiffs object to the exhibits Defendants appended to their reply papers on the ground that the exhibits represent new arguments, which are improper in reply. The exhibits consist of the transcript to the grand jury proceedings at issue in this case and affidavits from witnesses to those proceedings. In light of Plaintiffs' arguments in their opposition papers that the grand jury did not have probable cause to indict Plaintiffs for official mis-

conduct and that Defendants tainted these proceedings by offering (or attempting to offer) perjurious testimony and false evidence, the grand jury transcript is proper rebuttal evidence. Similarly, the affidavits are proper rebuttal to Plaintiffs' arguments that grand jury witnesses perjured themselves and/or Defendants attempted to coerce false testimony. Finally, the stipulations regarding the pending state court action were proper rebuttal evidence to Plaintiffs' argument that that action established that Defendants destroyed evidence.

Defendants argue that these claims should be dismissed because: (1) testimony (grand jury and trial) is protected by absolute immunity; (2) Defendants were not acting under color of state law when they testified; (3) Defendants' statements to the media are protected by the First Amendment; and (4) Plaintiffs have failed to show stigma plus, which is a necessary element of a constitutional defamation claim. The first two arguments apply only to Plaintiffs' defamation claims arising out of Defendants' grand jury and trial testimony; the Court will consider these arguments first.

### (a) Absolute Witness Immunity

■ Defendants argue that the Court should dismiss Plaintiffs' Section 1983 defamation claims arising out of Defendants' grand jury and trial testimony pursuant to the doctrine of absolute witness immunity.[13] The Supreme Court has affirmed the applicability of absolute witness immunity to Section 1983 actions arising out of or caused by the substance of public officials' allegedly false trial testimony. *See Briscoe v. LaHue*, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983). This immunity also applies to grand jury testimony. *See San Filippo v. U.S. Trust Co. of New York*, 737 F.2d 246, 254 (2d Cir.1984), *cert. denied*, 470 U.S. 1035, 105 S.Ct. 1408, 84 L.Ed.2d 797 (1985). Accordingly, Plaintiffs' Section 1983 claims for defamation arising out of trial and/or grand jury testimony of Defen-

dants Zwack, Madden, and Cybulski are dismissed because these Defendants are entitled to absolute witness immunity.[14]

### (b) Color of State Law

■ Alternatively, Plaintiffs' defamation claims based on Defendants' allegedly false testimony must be dismissed because, when testifying, Defendants were not acting under the color of state law.[15] *See, e.g., Bennett v. Passic*, 545 F.2d 1260 (10th Cir.1976) ("[W]itnesses who testify at trial are not acting under color of state law."); *Bates v. New York City Transit Auth.*, 721 F.Supp. 1577, 1580 (E.D.N.Y.1989) ("Plaintiff's claim is not based on what Corkran did while clothed with his official authority as a transit police officer, but rather on actions that occurred while he was testifying at an examination before trial in a civil suit. A witness testifying in state court does not act under color of state law for purposes of 42 U.S.C. § 1983.") (citations omitted); *Warren v. Applebaum*, 526 F.Supp. 586, 587 (E.D.N.Y.1981) ("[W]itnesses at trial are not acting under color of state law and as a consequence, their false testimony cannot give rise to a cause of action under Section 1983.").

### (c) Stigma Plus

Plaintiffs also assert a Section 1983 defamation claim premised on statements Defendants made to the media. Defendants argue that these claims should be dismissed because they do not satisfy the

**13.** To the extent Plaintiffs bring a claim against Defendant Ehring for defamation, that claim is limited to statements to the media because Ehring did not testify before the grand jury or at trial.

**14.** The "complaining witness" exception established in *White v. Frank*, 855 F.2d 956 (2d Cir.1988), is inapplicable to Plaintiffs' claims for defamation because the defamation claims are based on the substance of trial testimony rather than actions surrounding the initiation or continuance of a criminal prosecution. *See id.* (At common law "[i]n an action for defamation, the perjurious witness... enjoyed absolute immunity...."); *see also San Filippo*, 737 F.2d at 254 ("[A] witness has absolute

immunity from § 1983 liability based on the substance of his trial testimony."); *Fowler v. Robinson*, 1996 WL 67994, at *8 (N.D.N.Y. Feb.15, 1996) ("[A]bsolute immunity is available 'only where the constitutional tort is simply giving false testimony...'") (quoting *White*, 855 F.2d at 961). For a full discussion of this exception see *infra* Section II(D)(2)(a).

**15.** Unlike police officers, who sometimes are found to act under color of state law when they testify, *see Briscoe v. LaHue*, 663 F.2d 713, 721 (7th Cir.1981), *aff'd*, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983), the Defendants in this case did not testify while acting in their official capacity.

"stigma plus" standard. Plaintiffs respond that they suffered significant damage to their reputation and that the statements prevented them from pursuing jobs in their chosen profession.[16]

In order to state a claim for defamation under Section 1983, a plaintiff must establish both that the statements at issue were defamatory and that they deprived him of a liberty or property interest. *See Siegert v. Gilley,* 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991) ("Defamation by itself, is a tort actionable under the laws of most states but not a constitutional deprivation"), *reh'g denied.* 501 U.S. 1265, 111 S.Ct. 2920, 115 L.Ed.2d 1084 (1991); *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), *reh'g denied,* 425 U.S. 985, 96 S.Ct. 2194, 48 L.Ed.2d 811 (1976); *Morris v. Lindau,* 196 F.3d 102, 114 (2d Cir.1999). "For a government employee, a federal cause of action for deprivation of a liberty interest arises when the alleged defamation occurs in the course of some negative alteration of the employee's status, such as dismissal or refusal to rehire." *Morris,* 196 F.3d at 114 (citing *Neu v. Corcoran,* 869 F.2d 662, 667 (2d Cir.1989)); *see also Donato v. Plainview–Old Bethpage Central Sch. Dist.,* 96 F.3d 623, 630 (2d Cir.1996), *cert. denied,* 519 U.S. 1150, 117 S.Ct. 1083, 137 L.Ed.2d 218 (1997); *O'Neill v. City of Auburn,* 23 F.3d 685, 692 (2d Cir.1994). "In addition, the defamation must have occurred close in time to the dismissal or other negative employment action for an employee to succeed on a claim of a liber-

ty deprivation." *Morris,* 196 F.3d at 114 (citing *Martz v. Incorporated Village of Valley Stream,* 22 F.3d 26, 32 (2d Cir. 1994)). Statements which implicate a liberty interest (when coupled with adverse employment action) may include charges of dishonesty, illegality, or professional incompetence. *See Donato,* 96 F.3d at 630. However, "governmental allegations of professional incompetence do not implicate a liberty interest in every instance. Such allegations will support a right to a name-clearing hearing only when they denigrate the employee's competence as a professional and impugn the employee's professional reputation in such a fashion as to effectively put a significant roadblock in that employee's continued ability to practice his or her profession." *Donato,* 96 F.3d at 630 (citing *O'Neill v. City of Auburn,* 23 F.3d 685, 692 (2d Cir.1994)).

A majority of the allegedly defamatory statements Plaintiffs complain of involve Cipolla's alleged responsibility for supervising and/or finding work for Van Ort. *See* Complaint, ¶ 36; Cipolla Aff. Exs. A–E. These statements do not meet the stigma plus standard for numerous reasons. First, the statements are not substantively the type that implicate liberty interests. *See, e.g., Donato,* 96 F.3d at 624.[17] Moreover, the statements were not concurrent to or connected with Plaintiffs' termination/ resignation or any other negative employment action. Thus, the only potential damage flowing from these statements is reputational damage. It is well-settled that this type of injury is insuffi-

---

**16.** Plaintiffs' affidavits list the "constitutional deprivations" which they believe Defendants deprived them of. Neither mention injury related to the defamation. *See* Cipolla Aff. at ¶ 58; Martin Aff. ¶ 15. These paragraphs read: "I believe I suffered a number of Constitutional injuries. First and foremost, I was forced to submit to the jurisdiction of the County Court based on an indictment that was procured through lies, fraud and the withholding of exculpatory evidence. Secondly, after surrendering to the Court, I was forced to undergo several hours of custody, as pedigree information was taken from me by law enforcement officials, and as my finger-

prints were taken. Thirdly, I was forced to endure a public trial that lasted nearly three weeks, at great expense to me financially and emotionally." *See* Martin Aff. at ¶ 15. Cipolla's statement adds "I was forced to attend scheduled Court appearances for a period over one year," and is in all other respects identical. *See* Cipolla Aff. at ¶ 58.

**17.** Similarly, the statements made by Defendants before the grand jury were not substantively the type which would implicate liberty interests.

cient to establish a constitutional claim and should be addressed by state tort law rather than Section 1983. *See Valmonte v. Bane*, 18 F.3d 992, 1000 (2d Cir.1994) ("[T]he deleterious effects which flow directly from a sullied reputation would normally also be insufficient. These would normally include the impact that defamation might have on job prospects or, for that matter, romantic aspirations, friendships, self-esteem, or any other typical consequence of a bad reputation."); *Zemsky v. City of New York*, 821 F.2d 148, 151 (2d Cir.1987) ("The Supreme Court has held that an individual whose reputation is injured by the remarks of a public official, but who suffers no resultant tangible injury such as loss of employment as a result of the defamation, is not deprived of a liberty or property interest protected by the due process clause.") (citing *Paul*, 424 U.S. at 699–710, 96 S.Ct. 1155), *cert. denied*, 484 U.S. 965, 108 S.Ct. 456, 98 L.Ed.2d 396 (1987), *reh'g denied*, 486 U.S. 1019, 108 S.Ct. 1760, 100 L.Ed.2d 221 (1988); *see also Morris*, 196 F.3d at 114 (2d Cir.1999); *O'Neill*, 23 F.3d at 691 n. 2.

 Certain statements made after the initiation of the grand jury investigation and after Plaintiffs' indictment are more troubling. During this period, Cybulski stated to the press: "One of the fundamental reasons that Mr. Cipolla was terminated from county employment is because it became apparent that he was incapable of managing his department, fulfilling his job requirements, and taking responsibility for his action or inactions.... Mr. Cipolla is merely a disgruntled ex-employee taking the only opportunity he has been provided to strike back at Henry [Zwack] because he was fired." *See* Cipolla Aff. Ex. G. Madden made statements implying that Cipolla was un-

trustworthy, *see* Cipolla Aff. Exs. E, F, and Zwack stated publicly that the indictments confirmed that his decision to terminate Plaintiffs was fully justified, implying that Plaintiffs' termination resulted from an internal investigation of the Van Ort debacle. *See* Cipolla Aff. Exs. J, K.[18] These statements are substantively sufficient to implicate a liberty interest, *see Donato*, 96 F.3d at 630–32 (discussing cases finding a liberty interest), however, they were made more than six months after Cipolla resigned and Martin was terminated.[19] The absence of the necessary nexus between the defamation and the time of termination/ resignation precludes a finding that Defendants' statements were made "in the course of" any adverse employment action and, thus, bars Plaintiffs' Section 1983 defamation claims. *See Morris*, 196 F.3d at 114 (defamation must be concurrent with adverse employment action); *Jaeger v. Board of Education*, 125 F.3d 844 (2d Cir.1997) (Table) (denying claim because of five month gap between employment action and alleged defamation); *Martz*, 22 F.3d at 32 (five month separation between termination and alleged defamation precludes constitutional defamation claim); *Gentile v. Wallen*, 562 F.2d 193, 198 (2d Cir.1977) (alleged defamatory statements made after plaintiff had been terminated from employment as public school teacher amounted to "simple defamation" which does not trigger due process rights); *Shanley v. Hanna* 1998 WL 146250, at *3 (N.D.N.Y. Mar.24, 1998) (McCurn, S.J.) ("[T]he absence in the complaint of an alleged nexus between the defamation and the loss of plaintiff's employment or a deprivation of some other independent legal right is fatal to plaintiff's claim pursuant to § 1983."). Accordingly, Defendants' motion for summary

---

**18.** Zwack provided both Plaintiffs favorable recommendations at the time they left office and publicly cited "philosophical differences" as the reason for their termination/resignation. *See, e.g.*, Cipolla Aff. Exs.

**19.** Handwritten dates on the newspaper articles appended to Cipolla's affidavit indicate that Cybulski and Madden's statement(s) were reported in or after July 24 and 27, 1997 and Zwack's statements were in or after September. *See* Cipolla Aff., Exs. Plaintiffs left County employment at the end of December, 1996.

judgment on Plaintiffs' Section 1983 defamation claims is granted.

## 2. Malicious Prosecution

Defendants next move for summary judgment on Plaintiffs' Section 1983 malicious prosecution claims. Defendants first argue that this claim is barred by absolute immunity and next that the claim should be dismissed on its merits.

### (a) Absolute Witness Immunity

Defendants argue that Plaintiffs' malicious prosecution claim should be dismissed on immunity grounds. As discussed in Section II(D)(1)(a), witnesses are generally afforded absolute immunity from civil liability for both grand jury and trial testimony irrespective of the truthfulness of that testimony.

In malicious prosecution actions, however, the Second Circuit has carved out an exception to absolute witness immunity for "complaining witnesses." *See White*, 855 F.2d at 956. Returning to the common law roots of the immunity doctrine, the *White* Court explained that there is a crucial distinction between a "mere witness" who is entitled to immunity and a "complaining witness" who is not. *Id.* at 958–59. The court stated that, at common law, "[t]hose whose role was limited to providing testimony enjoyed immunity; those who played a role in initiating a prosecution—complaining witnesses—did not enjoy immunity." *See id.; see also Morillo v. The City of New York*, 1997 WL 72155, at *1 (S.D.N.Y. Feb.20, 1997). The *White* Court went on to state:

> the distinction reflected the difference between the two causes of action by which those falsely accused sought to hold a witness liable. In an action for defamation, the perjurious witness was sought to be held liable only for the defamatory effect of his testimony, and in such an action he enjoyed absolute immunity upon a threshold showing that the allegedly defamatory statements

were relevant to the judicial proceedings. *Id.* (citing *Briscoe*, 460 U.S. at 330–32, 103 S.Ct. 1108). "However, in an action for malicious prosecution, the complaining witness was sought to be held liable for his role in initiating a baseless prosecution, and 'complaining witnesses were not absolutely immune at common law.'" *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 340, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)).

 Thus, Defendants Zwack, Cybulski, and Madden are immune from a malicious prosecution claim arising out of their testimony only if they are not complaining witnesses. *See id.; see also Robinson*, 1996 WL 67994, at *9. Assuming without deciding that Defendants Zwack, Cybulski, and Madden fit within the complaining witness exception to absolute witness immunity, the Court will consider the merits of the malicious prosecution claim against these Defendants. *See* Discussion *infra* at Section II(D)(2)(c).

### (b) Prosecutorial Immunity

 Defendant Ehring next argues that this claim should be dismissed against him pursuant to the doctrine of prosecutorial immunity. "Absolute immunity protects a prosecutor from § 1983 liability for virtually all acts, regardless of motivation, associated with his function as an advocate." *Dory v. Ryan*, 25 F.3d 81, 82 (2d Cir.1994). Thus, a prosecutor is entitled to absolute immunity for "all actions relating to their advocacy" even in the face of allegations of conspiracy. *Id.* ("As much as the idea of a prosecutor conspiring to falsify evidence disturbs us ... we recognize that there is a greater societal goal in protecting the judicial process by preventing perpetual suits against prosecutors for the performance of their duties."); *see also Pinaud v. County of Suffolk*, 52 F.3d 1139, 1148 (2d Cir.1995) (internal quotations and citations omitted); *Hill v. City of New York*, 45 F.3d 653, 659 (2d Cir.1995). The fact that Ehring is a prosecutor, however, does not immediately qualify him for abso-

lute immunity. This immunity depends on "the nature of the function performed, not [on] the identity of the actor who performed it." *Forrester v. White*, 484 U.S. 219, 229, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988); *see also Pinaud*, 52 F.3d at 1147. "When a prosecutor is engaged in administrative or investigative activities, he is entitled only to qualified immunity, and thus the individual district attorney defendants in this action are to be held absolutely immune from liability under section 1983 [only] for acts within the scope of [their] duties in initiating and pursuing a criminal prosecution." *Pinaud*, 52 F.3d at 1147 (citations omitted). The official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question. *See Burns v. Reed*, 500 U.S. 478, 111 S.Ct. 1934, 1939–40, 114 L.Ed.2d 547 (1991). At this juncture, Ehring has not provided evidence to support a finding as a matter of law that his actions as a liaison between the County and the County Attorney's Office fall within the protection of prosecutorial immunity. Accordingly, the Court will not dismiss Plaintiffs' claims on this basis.

### (c) The Merits

■ The Court must engage in two inquiries when faced with a Section 1983 malicious prosecution claim. First, the Court must determine whether the defendants' conduct was tortious. *See Singer v. Fulton County Sheriff*, 63 F.3d 110, 116 (2d Cir.1995). Second, the Court must consider "whether the plaintiff[s'] injuries were caused by the deprivation of liberty guaranteed by the Fourth Amendment." *Id.; see also Rarick v. DeFrancesco*, 94 F.Supp.2d 279, 290 (N.D.N.Y.2000) (Smith, M.J.); *Noel v. Houtman*, 1997 WL 176316 (N.D.N.Y. Apr.8, 1997) (Pooler, J.).[20]

■ To satisfy the first inquiry, Plaintiffs must establish the elements of a state law malicious prosecution claim. *See Janetka v. Dabe*, 892 F.2d 187, 189 (2d Cir. 1989). The elements of a malicious prosecution claim under New York Law include: "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as motivation for defendant's actions." *See Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir.1997) (quoting *Russell v. Smith*, 68 F.3d 33, 36 (2d Cir.1995) (citing cases)), *cert. denied*, 522 U.S. 1115, 118 S.Ct. 1051, 140 L.Ed.2d 114 (1998); *O'Brien v. Alexander*, 101 F.3d 1479, 1484 (2d Cir.1996).

It is undisputed that a criminal proceeding was initiated against Plaintiffs[21] and that the proceeding terminated in their favor. Accordingly, the Court will consider whether the proceeding was initiated on probable cause.

■ To show a lack of probable cause for commencing a criminal action, Plaintiffs must show the defendants had no " 'knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of.' " *Rounseville v. Zahl*, 13 F.3d 625, 629 (2d Cir.1994) (quoting *Pandolfo v. U.A. Cable Systems of Watertown*, 171 A.D.2d 1013, 568 N.Y.S.2d 981, 982 (4th Dep't 1991)). In cases where an individual is prosecuted pursuant to a grand jury indictment, there is a rebuttable presumption of probable cause. *See Green v. Montgomery*, 219 F.3d 52, 60 (2d Cir.2000) (citations omitted). "To rebut this presumption, the plaintiff must establish that

---

**20.** Plaintiffs also bring a malicious prosecution claim under the Fourteenth Amendment alleging violations of their right to procedural due process. The parties dispute whether this claim is proper. Because the Court finds that Plaintiffs have not established the elements of a prima facie case of malicious prosecution, it

is unnecessary for the Court to determine whether a procedural due process claim for malicious prosecution is proper in the circumstances of this case.

**21.** It is not clear that Defendants initiated this proceeding.

the indictment was produced by fraud, perjury, the suppression of evidence or other [conduct] undertaken in bad faith." *Bernard v. United States*, 25 F.3d 98, 104 (2d Cir.1994) (internal citation and quotation omitted); *see also White*, 855 F.2d at 962.

Plaintiffs allege that they have provided evidence from which a rational jury could conclude that the indictment was produced by fraud, perjury, the suppression of evidence or other bad faith conduct. Specifically, Plaintiffs allege that their affidavits and the affidavits of Kathleen Bull and Christina Mahoney suggest that Defendants conspired to present false information (in the form of both documentary and testimonial evidence) to the grand jury and that Defendants testified falsely before the grand jury. Further, Plaintiffs argue that the State Court decision in *Smith v. County of Rensselaer, et al.*, Index No. 192505 (N.Y.Sup.Ct. May 17, 2000), finding Zwack and the County in contempt for the destruction of documents and failure to produce documents related to the Van Ort matter pursuant to a request under the Freedom of Information Law ("FOIL") establish a question of fact regarding suppression of evidence.

Mahoney is the Director of Personnel for the County. Her affidavit states that she was asked to calculate the amount of money paid to Van Ort that "should not have been" and was later asked by Ehring to reduce this amount so that Van Ort would be charged with a misdemeanor rather than a felony. *See* Mahoney Aff. at ¶¶ 2–5 (appended to Cipolla Aff. as Ex. N).[22] Mahoney did not testify before the grand jury regarding these issues, rather, she testified regarding general personnel procedures, the decision to cancel Van Ort's accrued sick and vacation hours, and the facts that Cipolla was Van Ort's supervisor and he signed and/or authorized Van Ort's time cards. *See* Mahoney Testimony, July 9 and Sept. 4, 1997 Grand Jury Tr. Mahoney further stated that at some point prior to Plaintiffs' trial Zwack called her, Manette Eddy,[23] and Kathleen Bull into his office and asked them to file false sexual harassment charges with the New York State police against Cipolla and recruit other female employees to file such charges in order to tarnish Cipolla's character at the forthcoming trial. *Id.* at ¶ 5.[24] Mahoney refused to do this. No evidence of sexual harassment charges or allegations against Cipolla was presented to the grand jury. *See* Grand Jury Tr.

 The relevant (and admissible)[25] portions of the affidavit of Kathleen

---

22. Mahoney's calculations of the overpaid amount allegedly came to an amount over $1,000.00. *Id.* at ¶ 3. Mahoney stated that, after showing this amount to Defendant Ehring, Ehring told her to reduce the amount to a number less than $1,000.00. When Mahoney asked why, Mahoney stated that Ehring told her "Henry [Zwack] wants the amount to be less" because an amount over $1,000.00 would result in a felony rather than misdemeanor charge. After this incident, Mahoney allegedly informed Zwack, Cybulski, and Robert Smith, County Attorney, that Ehring had told her to make this change so that Van Ort would be charged with a misdemeanor rather than a felony. None of these individuals instructed Mahoney to place the proper amount in the records. *See id.* at ¶¶ 3–4. Defendants deny this meeting took place and Thomas Hendry, who Mahoney alleges attended the meeting, denies that he was present. *See* Hendry Aff. ¶ 3.

23. Eddy denies this meeting took place. *See* Eddy Aff. at ¶ 4.

24. The remaining paragraphs of Mahoney's deposition discuss allegedly illegal activities Zwack and his representatives requested she perform and allegations that Zwack required County employees to contribute to his reelection campaign. *See* Mahoney Aff. ¶¶ 6–7. The allegedly illegal actions and campaign contributions are unrelated to the prosecution or trial of Plaintiffs and, thus, are not relevant.

25. Bull's statement that Cipolla and Martin told her that Van Ort remained on the payroll (despite the fact that he did not perform any function for the County) as a result of a political deal between Zwack and the outgoing County Executive is inadmissible hearsay. *See* FED. R. EVID. 803. However, similar evidence was in front of the grand jury through Zwack's testimony.

Bull, a County employee who worked under Martin's supervision, include statements that Plaintiffs strongly objected to the continued employment and payment of Van Ort. *See* Bull Aff. at ¶ 4 (appended to Cipolla Aff. as Ex. O). Bull further stated that Zwack called her, Mahoney, and Manette Eddy into his office and asked them to file false sexual harassment charges against Cipolla and to find other people to do the same in order to tarnish Cipolla's character and that Zwack made this request in another meeting with Bull. *See id.* at ¶ 6. Moreover, Bull stated that Ehring asked her to lie to the grand jury. *Id.* at ¶ 7. Specifically, Bull stated that she told Ehring that Zwack had ordered payment of Van Ort over Martin's refusal and Ehring stated "You won't be saying that, right Kath" and that at about the time of the grand jury proceeding Zwack asked her to be a "character assasinator against [Plaintiffs]." Finally, Bull stated that she was asked to create a false job specification to "justify Dirk's existence" and that computer files regarding Van Ort were deleted from her computer. *See* Bull Aff. at ¶¶ 7, 10. Like Mahoney, Bull refused to file false sexual harassment charges or serve as a character assasinator against Cipolla. In fact, Bull was not called as a grand jury witness. Thus, a rational jury could not conclude that Defendants' alleged attempts to coerce false testimony from Bull tainted the grand jury proceedings or the subsequent indictment.

■ Plaintiffs further allege that Defendants' purportedly false testimony suggests that the Defendants conspired against them and presented false evidence to the grand jury. Conflicting testimony, however, is a routine part of the litigation process and, without more, cannot rebut the presumption of probable cause. *See, e.g., United States v. Gambino,* 59 F.3d 353, 365 (2d Cir.1995) (conflict in witness'

own testimony does not itself constitute perjury), *cert. denied,* 517 U.S. 1187, 116 S.Ct. 1671, 134 L.Ed.2d 776 (1996); *United States v. Miranne,* 688 F.2d 980, 989 (5th Cir.1982) ("The only evidence of perjury was in the conflict between the testimony of [two witnesses]. At most, this represented a contradiction in the testimony of two witnesses. Generally, the credibility of witnesses and the weight to be given to their testimony are questions within the province of the jury."), *cert. denied,* 459 U.S. 1109, 103 S.Ct. 736, 74 L.Ed.2d 959 (1983); *Hathaway v. County of Essex,* 995 F.Supp. 62 (1998) ("[A]llegedly conflicting testimony at the grand jury hearing... [is] insufficient to overcome the presumption of probable cause.") (citation omitted), *aff'd,* 172 F.3d 37 (2d Cir.1999), *cert. denied,* —— U.S. ——, 120 S.Ct. 222, 145 L.Ed.2d 186 (1999), *reh'g denied,* —— U.S. ——, 120 S.Ct. 853, 145 L.Ed.2d 718 (2000); *DiMascio v. City of Albany,* 1999 WL 244648, at *3 (N.D.N.Y. Apr.21, 1999), *aff'd,* 205 F.3d 1322 (2d Cir.2000) ("A mere conflict between witness' trial testimony alone is insufficient to suggest fraud, perjury or the withholding of evidence."); *Dale v. Kelley,* 908 F.Supp. 125, 134 (W.D.N.Y.1995) (conflict in testimony between two witnesses does not itself support a finding of perjury), *aff'd,* 95 F.3d 2 (1996); *Buitrago v. Scully,* 705 F.Supp. 952, 957 (S.D.N.Y.1989); *Wells v. Sinning,* 63 Misc.2d 20, 25, 310 N.Y.S.2d 594 (Sup. Ct.1969), *appeal dismissed,* 34 A.D.2d 682, 310 N.Y.S.2d 515 (2d Dep't 1970), *aff'd,* 28 N.Y.2d 916, 323 N.Y.S.2d 168, 271 N.E.2d 698 (1971).

Finally, Plaintiffs point to a State Court decision in a matter regarding FOIL requests where Defendants Zwack and the County were found in contempt for destroying documents related to the Van Ort matter. A review of the factual stipulations agreed to by the parties after this decision was issued [26] indicates that the

---

Bull's statement that she was asked to participate in illegal activities or harassed for not engaging in illegal activities are unrelated to Plaintiffs' prosecution and, thus, are irrelevant. *See* Bull Aff. at ¶¶ 9–11.

**26.** As of the filing of the motion papers, the stipulation had not been so ordered by the Judge.

only document destroyed was a press release. The press release was not destroyed until after it had been produced pursuant to FOIL, although there was some confusion as to this fact. The other documents that were "not preserved" were documents that were sent to the District Attorney's Office for use in the grand jury investigation. Defendants produced the documents for the grand jury without copying them and, once the documents were in the hands of the grand jury, they were under protective seal. The District Attorney refused to release the grand jury documents for the FOIL production until the seal was removed. *See* Stewart Reply Aff. at Ex. F.

Looking at the evidence in the light most favorable to Plaintiffs, it is insufficient to rebut the presumption of probable cause. The testimony of Bull and Mahoney does not establish wrongdoing on the part of Defendants. Assuming that a jury credits this testimony, it establishes only that Zwack attempted to tarnish Cipolla's reputation prior to trial and that Ehring asked Bull to testify falsely. Because both Mahoney and Bull refused to go along with the alleged schemes and Bull did not testify, Defendants' alleged attempts to put false evidence before the grand jury were unsuccessful. The document Defendants destroyed was a press release which had previously been produced under FOIL and

the documents that were not preserved were in the hands of the grand jury.

All but one of the material grand jury witnesses submitted affidavits at the behest of one of the parties in this action stating that they testified truthfully before the grand jury and that their testimony was not coerced.[27] *See* Mahoney Aff.; Manoni Aff. ¶ 3; Eddy Aff. ¶ 5; Cook Aff. ¶ 3. Sanders Aff. ¶ 2; Fitzpatrick Aff. ¶ 3; Cybulski Aff. ¶ 4; Madden Aff. ¶ 9. The record does not support Plaintiffs' allegations that Defendants put false incriminating documentary evidence before the grand jury,[28] that the prosecutor improperly focused the investigation on Plaintiffs (and off Zwack),[29] or that the prosecutor called Plaintiffs before the grand jury solely because he knew they were represented by an attorney and would refuse to waive their immunity.[30]

Drawing all reasonable inferences in favor of Plaintiff, a rational jury could conclude that Zwack and Ehring engaged in suspicious conduct and that they may have agreed amongst themselves to persuade others to produce false evidence to the grand jury.[31] However, there is no evidence from which a fair minded jury could reasonably conclude that Zwack and Ehring provided false evidence or testimony to the grand jury, caused false evidence or testimony to be provided to the grand jury, or that their conduct improperly influenced the grand jury proceedings in any way.[32] Moreover, there is no evidence

27. Rebecca Syrotinski, Trudy Clayton, the Van Orts, and Marion Gold did not supply affidavits.

28. Assuming for the sake of this motion that Van Ort's job description was false, *see* Bull Aff. at ¶ 9, this does not establish that the grand jury's indictment was tainted. The job description merely iterates duties that Van Ort could have performed. It in no way implicates Plaintiffs, names Plaintiffs as Van Ort's supervisors, or suggests that Plaintiffs acted improperly. *See* Grand Jury Ex. 29.

29. In fact, the grand jury considered charging Zwack with official misconduct but voted not to indict.

30. The grand jury requested that Plaintiffs be subpoenaed. *See* July 9, 1997 Grand Jury Tr. at 214.

31. Bull was not a grand jury witness and both Bull and Mahoney refused to create false sexual harassment charges against Cipolla.

32. A review of the grand jury transcripts illustrates that many of the points argued by Plaintiffs in this litigation were before the grand jury. For example, the grand jury was aware that Madden attempted to find Van Ort work, that Madden phoned Van Ort and asked him to change the time cards he had submitted while he was in Florida to reflect the use of vacation time, that Van Ort remained on the County payroll due to a politi-

from which a fair minded jury could reasonably conclude that the testimony or evidence before the grand jury was fraudulent. Accordingly, Plaintiffs have failed to rebut the presumption of probable cause and their malicious prosecution claim must fail. *See, e.g., Rivers v. O'Brien,* 83 F.Supp.2d 328 (N.D.N.Y.2000) (Kahn, D.J.); *Hathaway,* 995 F.Supp. 62 ("[A]llegedly conflicting testimony at the Grand Jury hearing, perceived shortcomings in defendants' investigation, and plaintiff's speculative allegations regarding defendants' motives... as evidence of fraud, suppression of evidence, or perjury are insufficient to overcome the presumption of probable cause.") (citation omitted); *McLean v. City of Rome,* 1998 WL 312350, at *8 (N.D.N.Y. June 8, 1998) (Pooler, J.) (granting summary judgment where "no competent evidence" supported claim that grand jury witnesses committed perjury); *Benjamin v. U.S.,* 554 F.Supp. 82, 85 (E.D.N.Y.1982) ("[O]nly intentional fabrication of facts *material to* the probable cause determination will generate tort liability.") (emphasis added).

▬▬ Assuming *arguendo* that Plaintiffs successfully rebutted the presumption of probable cause, the Court will consider whether, in spite of the alleged wrongdoing, the evidence supports a finding of probable cause. *See Jenkins v. City of New York,* 1999 WL 782509, at *15 (S.D.N.Y. Sept.30, 1999), *aff'd,* 216 F.3d 1072 (2d Cir.2000); *DiMascio,* 1999 WL 244648, at *3; *Mistretta v. City of New York,* 1999 WL 1129618, at *4 (E.D.N.Y. Oct 15, 1999). A review of the grand jury transcripts establishes that the indictment was in fact supported by probable cause. The grand jury heard testimony from sev-

eral witnesses who testified, *inter alia,* that Cipolla was Van Ort's supervisor, that Cipolla was in charge of finding Van Ort work, and that Cipolla was aware that Van Ort was not assigned work yet still authorized his pay. The grand jury also heard testimony that Martin ordered the processing of Van Ort's time cards despite irregularities and that she was aware Van Ort had not been assigned work, yet continued to be paid. Finally, the grand jury viewed documentary evidence that Cipolla signed Van Ort's time cards and signed payroll authorization forms authorizing payment to Van Ort.

Based on this evidence it was reasonable for the grand jury to find probable cause to indict Plaintiffs for official misconduct. Because the evidence supports a finding of probable cause, even if Plaintiffs had successfully rebutted the presumption attached to the grand jury indictment, summary judgment would be appropriate. *See, e.g., Posr v. Court Officer Shield # 207,* 180 F.3d 409, 417 (2d Cir.1999); *Jenkins,* 1999 WL 782509, at *15 ("[I]ndependent of the presumption, and without considering [the allegedly perjurious statements] there was ample probable cause for the indictment."); *DiMascio,* 2000 WL 232053, at *1 (dismissal proper in spite of alleged perjurious statements where evidence showed probable cause); *Mistretta,* 1999 WL 1129618, at *4 (Dismissal proper where evidence supported probable cause even where wrongdoing established).[33] Accordingly, Defendants' motion for summary judgment on this claim is granted.

### 3. Conspiracy

Plaintiffs next allege that Defendants engaged in a conspiracy to produce false

---

cal deal made by Zwack, that Zwack did not follow up to assure that Van Ort had been assigned work, that Zwack may have been aware that Van Ort was in Florida, and that numerous individuals in the County's employ felt that Van Ort's employment should have been discontinued earlier than it was. In light of this evidence, the grand jury considered indicting Zwack for criminal wrongdoing, however, after deliberating on the

charges, decided not to indict. *See* Grand Jury Tr.

**33.** Because the Court found that probable cause existed, it was not necessary to consider whether Plaintiffs produced evidence from which a rational jury could find Defendants acted with actual malice.

evidence and perjured testimony against them. Plaintiffs further allege that Defendants engaged in this conspiracy in an attempt to violate their constitutional right to be free from malicious prosecution.

### (a) Absolute Witness Immunity

 Zwack, Cybulski, and Madden first argue that this claim should be dismissed against them under the doctrine of absolute witness immunity discussed above. Absolute witness immunity, however, does not extend to allegations of extra judicial conspiracy between witnesses and the prosecutor or other witnesses. See San Filippo, 737 F.2d at 254; see also Taylor v. Hansen, 731 F.Supp. 72 (N.D.N.Y.1990) (McCurn, J.). Accordingly, Defendants' motion to dismiss on this basis is denied.

### (b) Prosecutorial Immunity

Defendant Ehring also seeks dismissal on immunity grounds. As discussed above, although the allegations of conspiracy do not negate prosecutorial immunity, in this case it is not clear that Ehring was acting within his prosecutorial capacity when he engaged in the complained of conduct. Thus, at this juncture, the Court cannot determine whether prosecutorial immunity bars this claim.

### (c) The Merits

 In order to state a claim for of conspiracy pursuant to Section 1983, Plaintiffs must establish both that Defendants acted in a willful manner, culminating in an agreement, understanding, or 'meeting of the minds' intended to deprive them of their constitutional rights and that Plaintiffs constitutional rights were actually violated. See Birnbaum v. Trussell, 371 F.2d 672, 676 (2d Cir.1966) ("If the appellees conspire to and did in fact deprive [plaintiff] of this right, they violated Section 1983."); Singer v. Fulton County Sheriff, 63 F.3d 110, 119 (2d Cir.1995), cert. denied, 517 U.S. 1189, 116 S.Ct. 1676, 134 L.Ed.2d 779 (1996); Quinn v. City of Johnstown,

(N.D.N.Y. Apr. 15, 1998) ("A plaintiff bringing a Section 1983 conspiracy claim must prove a violation of the underlying constitutional right.") (citation omitted), aff'd, 173 F.3d 845 (2d Cir.1999); Harmer v. City of Lockport, 2000 WL 210201, at *4 (W.D.N.Y. Feb.9, 2000) ("However, as plaintiff fails to demonstrate that defendants violated his rights under the United States Constitution, the conspiracy claims will therefore be dismissed."); Duff v. Coughlin, 794 F.Supp. 521, 525 (S.D.N.Y., 1992) (actual violation necessary for Section 1983 conspiracy claim); Rosenfeld v. Sample, 1986 WL 13940, at *5 (W.D.N.Y. Dec.11, 1986), aff'd, 819 F.2d 1130 (2d Cir. 1987) ("Here, this Court finds that the facts alleged fail to assert any actual violation of Constitutional rights. The plaintiff has therefore failed to assert adequately a violation of Section 1983 [based on a conspiracy]."). Assuming without deciding that the record supports a finding that Defendants intended to deprive Plaintiffs of their constitutional rights, agreed to do this, and took overt actions in furtherance of their illicit agreements, Plaintiffs' claims must be dismissed. As discussed above, Plaintiff has not established that Defendants' actions deprived them of any constitutional rights and, thus, their Section 1983 conspiracy claim must fail. See, e.g., Quinn, 1998 WL 187404, at *5 ("Insofar as the claim alleges a conspiracy to violate Quinn's First Amendment rights, it fails because Quinn fails to prove the underlying First Amendment violation....."). Accordingly, Defendants' motion for summary judgment on this claim is granted.

### 4. Remaining Claims

The Court has dismissed all of Plaintiffs' federal claims on their merits. Accordingly, it is not necessary to consider whether the County is liable pursuant to Monell v. Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), or whether Defendants are entitled to qualified immunity. Moreover, because there are no longer federal claims in this

case, the Court declines to exercise supplemental jurisdiction over the state law claims. *See* 28 U.S.C. § 1367; *Minzer v. Keegan,* 218 F.3d 144 (2d Cir.2000).

### III. Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is granted and the Complaint is dismissed in its entirety.

**IT IS SO ORDERED.**